AGATHA (named herein as Mrs. REGINALD) REICHMAN, Appellant, v. COMPAGNIE GENERALE TRANSATLANTIQUE, Respondent.

Argued March 8, 1943; decided April 22, 1943.

*Harold R. Zeamans* and *Milton Haas* for appellant.

*Edgar R. Kraetzer* and *David L. Corbin* for respondent,

Lewis, J. The plaintiff, while a passenger first-class on the defendant's steamship *Champlain* cruising from New York to the West Indies, placed cash in the amount of $160 and jewelry of the conceded value of $13,200 in a safe-deposit envelope and delivered the same for safe-keeping to the desk of the ship's cashier. She had taken this precaution after reading the following item of " General Information for Passengers " contained within a " Passenger List Booklet " with which she had been provided by the defendant after she came aboard ship: " Valuables. The particular attention of passengers is drawn to the ticket conditions regarding the carriage and custody of articles specified in Section 4281 of the revised Statutes of the United States; but passengers can, and are accordingly advised to protect themselves by insurance. The French Line has provided a safe at the Information Desk in which passengers may deposit money, jewels, ornaments, documents, or other valuables for safe keeping, and a deposit receipt will be issued by the Purser."

At the time of depositing the envelope at the cashier's desk there was delivered to the plaintiff a receipt which read as follows:

" COMPAGNIE GENERALE
TRANSATLANTIQUE
6 Rue Auber — PARIS

No. 4958                  Steamship CHAMPLAIN

Voyage No.

Received on deposit from Mrs. Reichman

sealed

without liability or responsibility of any nature while in the charge of the company or of the Captain.

On Board            193

For the Company
Cashier
(Signed)    Max Kleiner

Note: This receipt must be presented by the passenger to obtain the return of any deposit."

Later, when the plaintiff presented her receipt and demanded the return of her property, she was informed that her safe-deposit envelope could not be found. Further search under supervision of officers of the ship was unavailing. In short the defendant's failure to return to the plaintiff the envelope and its contents has led to the present action by which the plaintiff demands of the defendant steamship company that it make good her loss.

At the close of the trial the defendant, consistent with its prior offer of judgment, moved for a directed verdict of $250, in favor of the plaintiff. The motion by the defendant was in accord with the provisions of the plaintiff's passage contract which, as we shall see, formed the basis not only of her first cause of action but also of a separate and partial defense interposed by the defendant. The plaintiff then moved (1) for a directed verdict in her favor in the amount of $13,360 and (2) for the submission to the jury of issues of fact which it was claimed were presented by evidence introduced in support of the plaintiff's second cause of action in which she charged the defendant with the conversion of her property. The trial court denied the plaintiff's motions and, in response to the defendant's motion, directed a verdict of $250 in plaintiff's

favor. The judgment entered upon the directed verdict was thereafter unanimously affirmed at the Appellate Division. The case is here on appeal by the plaintiff by our permission.

Claiming that she was entitled at Trial Term to a directed verdict for the stipulated value of her property, the plaintiff asserts that her delivery of valuables to the defendant for safe-keeping constituted a common law bailment and that the defendant may not now invoke as a partial defense provisions in her contract of passage by which the defendant limited its liability to an amount fixed by an agreed valuation of the property lost.

In the verified bill of particulars furnished by the plaintiff is the statement — '' That the plaintiff was a passenger on board the S. S. Champlain, under no other expressed contract than that contained in Exhibit ' A ' annexed to the defendant's answer.'' Concededly Exhibit '' A '' is the ticket issued by the defendant to the plaintiff. It bears the caption '' Passage contract subject to the terms stated on this page and overpage.'' After numerous items which, among others, recite the name of the ship, its sailing schedule, the name of the passenger (the plaintiff) and the fare paid, there appears the statement — '' Passengers should read the terms of the contract of carriage stated below and overpage, their particular attention being called to the limitations of liability therein contained.'' Then follows the heading '' Terms of contract — Read before accepting,'' after which appear certain provisions which establish the conditions under which the defendant agreed to furnish the transportation accepted by the plaintiff:

'' In consideration of the sum of money hereinabove stated French Line (Compagnie Generale Transatlantique) agrees to accept the persons above named as passengers for the voyage above described subject to the terms of this contract stated on this page and overpage:

'' The purchaser hereof covenants and warrants that he is duly authorized by or in behalf of all of the passengers named herein to agree to all the stipulations of this contract stated on this page and overpage, and by accepting and/or using this ticket he and/or they do agree accordingly and do agree that the same shall be binding on them with the same force and effect as if they had every one of them signed this contract.

\* \* \* \* \* \* \*

" 4. REGULATIONS AND LIMITATIONS OF CARRIER'S LIABILITY WITH RESPECT TO PERSONAL PROPERTY. (a) The term ' baggage ' as used herein means only trunks, handbags, valises, satchels and bundles, containing such wearing apparel and personal effects as are necessary and appropriate to the purpose of the journey and to the passenger's station in life. \* \* \*

" (g) Each first-class passenger represents, and it is hereby agreed, that the total value of his baggage, as defined in section 4(a) of this contract, does not exceed $150 and that the total value of all other property taken with him on the voyage, and carried on his person or retained in his possession, does not exceed $100; \* \* \* *The Carrier's liability, if any, \* \* \* shall not exceed the above amount in the event of loss, damage or delay to any of the passenger's property taken with him on the voyage,* the fare for the voyage and the rate of excess baggage tariff being in part based upon the above valuation. Nevertheless, each passenger may, prior to embarkment, deliver a declaration in writing, specifying a higher value, to the Carrier at 610 Fifth Avenue, New York, N. Y. U. S. A. or at 6 Rue Auber, Paris, France, or to the Carrier's baggage master, and pay an additional amount of 1% of the excess of value thus specified over the said amount, for which a written receipt must be obtained, in which case the Carrier's liability shall not exceed such specified value." (Emphasis supplied)

The jewels and currency placed by the plaintiff in the safe-deposit envelope and delivered to the defendant's agent for safekeeping constituted " the passenger's property taken with [her] on the voyage " within that provision of her passage contract, quoted above, by which was limited the " Carrier's liability." The plaintiff's act of acceptance of the passage contract gave rise by implication to her assent to the limitation upon the defendant's liability which was one of the express conditions upon which the defendant undertook to transport the plaintiff. Had she desired to evaluate the property which she took upon the voyage at a figure higher than that which fixed the limit of defendant's liability, and thereby protect herself in full against the loss of her valuables, she could have done so, under provisions of the contract, by paying one per cent of whatever excess value she might specify.

We think the agreed valuation clause of the passage contract, which the defendant now invokes, was in no sense ambiguous. It was reasonable in its terms and was authorized by the settled law of this jurisdiction. (*Kilthau* v. *International Mercantile Marine Co.,* 245 N. Y. 361, 365.) Indeed what was said in *Murray* v. *Cunard S. S. Co.* (235 N. Y. 162 at pp. 165, 166) applies with equal force to the facts now before us: " The law is settled in this state that a ticket in this form, issued by a steamship company for a voyage across the ocean, is more than a mere token or voucher. It is a contract, creating the obligation and defining the terms of carriage (*Steers* v. *Liverpool etc., S. S. Co.,* 57 N. Y. 1; *Tewes* v. *North German Lloyd S. S. Co,* 186 N. Y. 151, 155; 1 Williston on Contracts, §§ 90, 90a, 90b). The ruling is in accord with judgments in other jurisdictions (*Fonseca* v. *Cunard S. S. Co.,* 153 Mass. 553; *O'Regan* v. *Cunard S. S. Co.,* 160 Mass. 356; *Secoulsky* v. *Ocean Steam Nav. Co.,* 223 Mass. 465; cf. *N. Y. etc., R. R. Co.* v. *Beaham,* 242 U. S. 148, 151; *Cooke* v. *T. Wilson Sons & Co.* 1916, 85 L. J. R. [K. B.] 895, 896; *Hood* v. *Anchor Line,* 1918, A. C. 837, 845, 849). This is not a case of a mere notice on the back of a ticket, separate either in substance or in form from the body of the contract (*The Majestic,* 166 U. S. 375). Here the condition is wrought into the tissue, the two inseparably integrated. This ticket, to the most casual observer, is as plainly a contract, burdened with all kinds of conditions, as if it were a bill of lading or a policy of insurance. ' No one who could read could glance at it without seeing that it undertook to prescribe the particulars which should govern the conduct of the parties until the passenger reached the port of destination.' (*Fonseca* v. *Cunard S. S. Co.,* 153 Mass. 553). In such circumstances, the act of acceptance gives rise to an implication of assent (1 Williston on Contracts, §§ 90, 90a, 90b; *Fonseca* v. *Cunard S. S. Co., supra, N. Y. C. Ry. Co.* v. *Beaham, supra.*) The passenger who omits to read takes the risk of the omission." (See also *Tewes* v. *North German Lloyd S. S. Co.,* 186 N. Y. 151, 154, 155; *Baron* v. *Compagnie Generale Transatlantique,* 108 F. 2d 21.)

In the case at bar the contract of passage — unlike the contract involved in *Hasbrouck* v. *N. Y. C. & H. R. R. R. Co.* (202 N. Y. 363), upon which the plaintiff relies — does not avoid liability for the entire loss suffered by the plaintiff; it places upon the

plaintiff's property taken with her on the voyage a valuation which establishes the measure of the defendant's limited responsibility in the event liability is established. (*D'Utassy* v. *Barrett*, 219 N. Y. 420, 424, 425.)

Passing to the plaintiff's claim that the trial court erred in dismissing her second cause of action which charges the conversion of her property by the defendant: We find no evidence that the defendant converted to its own benefit the property which is the subject of this suit; nor is there evidence that in connection with the plaintiff's property the defendant was guilty of an affirmative act of wrongdoing which will deprive the defendant of the benefit of its contract with the plaintiff for a liability limited to an agreed valuation. (*Magnin* v. *Dinsmore*, 70 N. Y. 410, 417–419; *Wamsley* v. *Atlas S. S. Co.*, 168 N. Y. 533, 536–538.) In the present case we find in the text of the agreed valuation clause (§ 4 [g]) that " * * * the fare for the voyage * * * [is] in part based upon the above valuation." In those circumstances — " The distinction must be borne in mind between a limitation of liability and an agreed valuation in case of liability. When it is urged that the limitation of value should not be applied to any case of theft by the carrier's employees, for the reason that the company is liable for such acts as if the company had been the thief (*Adams Express Co.* v. *B. & W. Co.*, 35 App. Cas. [D.C.] 208), the argument loses sight of this distinction. When the agent acts within the scope of his employment in taking possession of the shipment ' in legal effect it was the same as if the defendant, personified, had taken it ' (VANN, J., in *Hasbrouck* v. *N. Y. C. & H. R. R. R. Co.*, 202 N. Y. 363, 373), but the liability may exist and the valuation of the shipment in case of liability may be agreed upon when the rates for transportation are based on the valuation of the goods intrusted to the carrier." (*D'Utassy* v. *Barrett, supra,* p. 424; and see *Millhiser* v *Beau Site Co.*, 251 N. Y. 290, 294, 295; *M. & T. Trust Co.* v. *Export S. S Corp.*, 262 N. Y. 92, certiorari denied 290 U. S. 650.)

The judgment should be affirmed with costs.

RIPPEY, J. (dissenting): On February 14, 1937, plaintiff, who spoke and understood the English language, was a first-class passenger and member of a party of some seven hundred persons on

a luxury cruise then being conducted by defendant on its French Line steamer *Champlain* from the Port of New York to Kingston, Nassau, and to other ports of call, thence returning to New York. On that day, upon demand, the defendant failed to return to her certain jewelry of the stipulated value of $13,200 and $160 in cash which she had entrusted to the exclusive custody and possession of the defendant and which was accepted by it for safekeeping, and she thereupon brought this action to recover for her loss.

In her complaint plaintiff sets up two causes of action, each sufficient upon its face,—the first for breach of defendant's contract of bailment, the second for conversion. Aside from denials of various allegations of the complaint, the defendant pleaded as a separate and partial defense that its liability was limited, in any event, to the sum of $250, beyond which amount the plaintiff could not recover, if entitled to recover at all. Upon the trial, there was no substantial dispute on the essential governing facts; both parties moved for a directed verdict for the plaintiff on the first cause of action, the plaintiff moving for recovery of the full amount of her loss and the defendant for $250 only. The trial court granted defendant's motion, together with its additional motion to dismiss the second cause of action, refusing, upon plaintiff's specific request, to submit the case to the jury on the theory of conversion. Upon unanimous affirmance by the Appellate Division of the judgment entered upon that decision, every fact necessary for plaintiff's recovery under her first cause of action has been finally and conclusively determined in her favor and the only question presented upon this appeal upon that cause of action and the defense referred to is whether, as matter of law, defendant's liability for plaintiff's loss was limited to $250.

Plaintiff embarked upon the vessel upon which the cruise was being conducted at the Port of New York on the evening of February 10, 1937, shortly before the time of sailing. She had paid the required cost and was a passenger properly on board the ship. She then had with her, but not as a part of her baggage, the cash in question for extra spending money, together with the jewelry which was concededly appropriate to her station in life and not unlike that used by other women passengers when formal attire for all passengers and evening gowns and jewelry

and personal ornaments of value for the women aboard was in order at dinner and subsequent dances, social functions and entertainments arranged on board ship or on shore at ports of call by the defendant for the passengers during the cruise. At the time of embarkation, a booklet was furnished to the plaintiff and similar booklets to other passengers in which names of the passengers were listed and miscellaneous general information was printed concerning various services which defendant rendered to the passengers on board. Among other things appeared the statement, " The French Line has provided a safe at the Information Desk in which passengers may deposit money, jewels, ornaments, documents, or other valuables for safe-keeping, and a deposit receipt will be issued by the Purser." Notices were posted throughout the ship to the effect that safe deposit boxes and safety envelopes were available for the use of passengers and it was the general practice of defendant to advise passengers who were known to have jewelry to take safe deposit boxes and safety envelopes for the deposit of their valuables.

In accordance with the practice and rules of defendant, one of the duties of the chief cashier imposed upon him by the defendant was to receive and retain the passengers' valuables for safekeeping. Some 48 private safe deposit boxes were provided for the use of the passengers who requested them. When one such was assigned to a passenger for his individual and exclusive use, he was given a key to one lock and the master key for the second lock was retained by the chief cashier and his assistant so that access to the box could only be had jointly by the passenger and one of the cashiers. Such a situation did not exist when safety envelopes were provided. In that case, a receipt was given to the passenger but no key to the box. All keys were retained by the chief cashier and his assistant. This arrangement was necessary since two of the safe deposit boxes only were used for the safekeeping of some 300 safety envelopes belonging to as many different passengers. Obviously it was impracticable to furnish keys to the two boxes to all such depositors. At no time between the receipt of the envelope and its subsequent delivery to the passenger did the latter have any control over the deposit or any access to or control over the safe deposit box containing his envelope.

The information desk, about four feet high, was located on "A" deck in an enclosed space in the center in front of and facing the main stairs. A chief cashier or his assistant was always on duty. The chief cashier's office was on the left of the desk. Back of his office was the office of the assistant cashier and behind that was the safe containing the safe deposit boxes. The cashier's office was open continuously for the receipt of passengers' valuables from 9 A. M. to 10 P. M. each day during the voyage. Others generally using that portion of the boat for offices within the same enclosure were a stenographer and also a wireless secretary who had his desk at the right end of the information desk. In addition, the night clerk, purser and a cleaner were permitted behind the counter. There were wooden gates with glass panels on top between the offices of the chief cashier and the wireless secretary and the center part of the counter which might be locked from the interior, but they were never locked. Access to the enclosure containing the safe deposit boxes was ordinarily obtained only through the cashier's office.

On the morning of February 11, the plaintiff proceeded to the information desk and requested the use of a safe deposit box in which to deposit her jewelry and was told that none was available. She thereupon requested information as to what she would do with the jewelry and money which she had with her and the cashier said, " We have envelopes. You can have an envelope, like everybody else, and make deposits like everybody else, and deposit everything in there, seal the envelope, and we will give you a receipt, and we will put it in the safe." She then received an envelope from the cashier with defendant's name and the location of its various offices stamped upon it together with a printed notice that " This is a safety envelope " and a printed direction in French and English to " seal carefully, and write your name where indicated on the other side." As directed, she proceeded, in the presence of defendant's officers, to place her jewelry and extra money in the envelope, then sealed the envelope, signed her name across the seal and delivered it to the cashier. Thereupon the cashier gave her a receipt numbered 4958, removed by him from a book of receipts supplied by defendant in which he retained the stub for office use. The receipt was printed in the French language, but

not then translated for the plaintiff, in which it was stated that defendant had received from her the sealed envelope " without liability or responsibility of any nature while in the charge of the company or of the Captain." At the bottom of the envelope the cashier placed the number 4958, corresponding to the number on the receipt.

The ship was in port at Havana, Cuba, on February 13 and 14. Plaintiff procured the envelope containing her money and jewelry from the cashier during the afternoon of February 13 for use at a formal dinner party on shore that evening and returned to him her deposit receipt. On the morning of February 14, she went to the cashier's desk and procured another safety envelope according to usual practice and, in the presence of the cashier, she placed her money and jewelry in the envelope, sealed the envelope, wrote her name across the seal and delivered it to the cashier. He thereupon put on the envelope the number 4958 and handed to her the receipt which she had surrendered to him on the previous afternoon. At about eight or eight-thirty o'clock on the evening of February 14, she went to the desk and asked for her envelope and exhibited her receipt to the cashier in charge. The cashier took the number of the receipt and went to the safe to look for the envelope and returned and told her it was not there. She promptly reported her loss to the purser and captain of the ship and presented her claim therefor. An extensive search was made by the purser and other officers of the ship and finally an empty envelope, torn apart, with contents gone, but with her name written on the back across the seal, was found in a wastebasket in the room containing the information desk and the safe. Whether it was the envelope which last contained her property was not shown. No explanation has ever been made by defendant of its failure to return to the plaintiff the property which it had received for safekeeping.

Under some circumstances, a carrier may limit its liability by provisions in the contract of passage as set forth in the passenger's ticket (*Steers* v. *Liverpool, N. Y. & P. S. S. Co.,* 57 N. Y. 1; *Tewes* v. *North German Lloyd S. S. Co.,* 186 N. Y. 151, 155; *Murray* v. *Cunard S. S. Co.,* 235 N. Y. 162). A carrier might also limit its liability under some circumstances by a

separate contract based upon a suitable consideration. The receipt for the property was issued to the plaintiff when she left it with the defendant for safekeeping. However, under the circumstances of this case, the defendant has failed to limit its liability for loss either by provisions in the ticket or by the receipt or by both combined. The wording of the receipt has been quoted above. Relating to liability and freedom from liability for loss, the ticket contains these pertinent provisions:

" 3. CAUSES FOR WHICH THE CARRIER IS NOT LIABLE   *   *   * The Carrier shall be entitled to avail itself of all exemptions or limitations of liability contained in Title 46, ch. VIII, of the Code of Laws of the U. S. A." (The Harter Act.)

" 4. REGULATIONS AND LIMITATIONS OF CARRIER'S LIABILITY WITH RESPECT TO PERSONAL PROPERTY.

"(a) The term ' baggage ' as used herein means only trunks, handbags, valises, satchels and bundles, containing such wearing apparel and personal effects as are necessary and appropriate to the purpose of the journey and to the passenger's station in life.

"(b) The Carrier does not undertake to carry as baggage any merchandise, samples, furniture, household goods, tools of trade, property of others than the passenger, pictures, perishable goods, glassware, liquids, bric-a-brac, money, documents, valuables, or any of the articles listed in sec. 4281 of the Revised Statutes of the United States. Such articles must be shipped as commercial cargo under bills of lading. The passenger hereby warrants that no such articles are or will be contained in any receptacle or container presented by him as baggage hereunder, and, if any such articles are shipped by the passenger as baggage in breach of this warranty, no liability shall attach to the Carrier on account thereof as Carrier or bailee or in any other capacity, either for negligence or otherwise.

*   *   *   *   *   *   *

"(g) Each first-class passenger represents, and it is hereby agreed, that the total value of his baggage, as defined in section 4 (a) of this contract, does not exceed $150, and that the total value of all other property taken with him on the voyage, and carried on his person or retained in his possession, does not exceed $100; each passenger of any class other than first rep-

resents, and it is hereby agreed, that the total value of his baggage, as defined in section 4 (a) of this contract, does not exceed $100; and that the total value of all other property taken with him on the voyage, and carried on his person or retained in his possession, does not exceed $75.00. The Carrier's liability, if any (and whether or not excess baggage is carried and paid for) shall not exceed the above amount in the event of loss, damage or delay to any of the passenger's property taken with him on the voyage, the fare for the voyage and the rate of excess baggage tariff being in part based upon the above valuation. Nevertheless, each passenger may, prior to embarkment, deliver a declaration in writing, specifying a higher value, to the Carrier at 610 Fifth Avenue, New York, N. Y. U. S. A. or at 6 Rue Auber, Paris, France, or to the Carrier's baggage master, and pay an additional amount of 1% of the excess of value thus specified over the said amount, for which a written receipt must be obtained, in which case the Carrier's liability shall not exceed such specified value.

"(h) A reasonable amount of space in a deposit box or safe on board, if the steamer is so equipped, will be allowed each passenger upon request, but, in consideration of the Carrier's furnishing such deposit box or safe without extra cost to passengers, and inasmuch as no charge is made therefor, it is mutually agreed that the Carrier's liability, if any, for loss of, or damage to, the deposit made therein by the passenger shall not be increased by reason of a deposit being made. In the event of declaration of excess value, as herein provided, the Carrier may require that valuables be placed in the custody of the Purser, but without assumption of any increased responsibility on the Carrier's part.

" (i) The Carrier does not assume any responsibility for unchecked baggage, nor for any articles which the passenger retains under his personal control, in his cabin or elsewhere."

A reading and strict construction of the provisions of the ticket indicate that the property deposited with defendant was not " baggage " as defined by defendant, the maximum amount of the recoverable loss of which is fixed at $150, nor was it " other property taken with him on the voyage " for which the limit of recovery for loss was fixed at $100, since it was neither " carried on his person or retained in his possession." Nor

was it retained " under his personal control, in his cabin or elsewhere." On the contrary, the property was delivered to defendant and accepted by it for safekeeping and it was in its exclusive possession and under its exclusive control at the time the loss occurred. As to loss of such, the contract contains no limit of liability. The contract must be construed, so far as it purports to limit the carrier's liability, to baggage or property taken by the carrier into its possession for the journey. As to other personal property of the passenger, though retained in the exclusive possession of the passenger, for his use during the voyage, the provisions neither have nor were intended by defendant to have any application (*Holmes* v. *North German Lloyd S. S. Co.*, 184 N. Y. 280). If defendant had understood the provisions of the ticket otherwise, there would have been no occasion to exact from the passenger when she delivered the property into defendant's exclusive possession for safekeeping an absolute release from liability from whatsoever cause arising.

Nevertheless, if the contract were to be liberally construed as urged by defendant, the theory that there was a limitation of $250 recovery still could not prevail. For the type of property in question and the use which was to be made of it, the attempted limitation is unavailable (*Holmes* v. *North German Lloyd S. S. Co., supra*). It limits the carrier's liability to a fixed sum since no reasonable alternative was offered to a passenger who did not wish to be bound by the carrier's stated exemption from liability and is consequently void (*Straus & Co.* v. *Canadian Pacific Ry. Co.*, 254 N. Y. 407; *The Kensington*, 183 U. S. 263). The clause permitting of a higher recovery when payment of one per cent is made of the excess value evidently relates only to property to be left in the possession of the carrier for the voyage. If its meaning is ambiguous, it must be so construed (*Holmes* v. *North German Lloyd S. S. Co., supra*). Though plaintiff had declared a higher value on her jewelry under section 4 (g) of the ticket, defendant would still not be liable for her loss under section 4 (b), which must be read and construed with subdivision (g), even though the loss was due to the negligence of defendant, unless the property was shipped under a bill of lading. If so shipped, defendant would still not be liable by virtue of the Federal statutes applicable to the carriage of goods by sea (U. S. Code, tit. 46, ch. 8,

§ 192; ch. 28, § 1304). Attempted complete absolution from all liability contained in the receipt was contrary to public policy and void (*Straus & Co.* v. *Canadian Pacific Ry. Co., supra*).

There is no doubt that plaintiff's property was lawfully in the possession of defendant. Affirmatively and conclusively it appears from uncontradicted testimony and it has finally been found by the lower courts that the services rendered by the officers of the ship were not voluntary and outside of the scope of their duties. It appears above that the possession of the property by defendant was not that of a carrier under its contract of carriage since it had not checked the same as baggage nor had the property been entrusted to it for the journey. It was entrusted to the defendant only for the special purpose of aiding the passenger in safeguarding her property in accordance with regulations and rules established by the defendant itself. Its possession, therefore, was that of a bailee and its obligation to the plaintiff in regard to her property is defined and measured by the law of bailments (*Hasbrouck* v. *N. Y. C. & H. R. R. R. Co.*, 202 N. Y. 363). As pointed out in the *Hasbrouck* case (pages 373, 374), " Whether it was a bailee for hire in performing a service incidental to her carriage as a passenger with the obligation of ordinary care, or a gratuitous bailee with the obligation of slight care, the result is the same. In either event, as we held in the case cited, some care was required, yet none was shown. The law required the defendant to return all the property intact, or to explain its loss in some satisfactory way, but it did neither." The undertaking to return the property to plaintiff on demand was necessarily a part of the contract under which the defendant received and retained the property in its possession for safekeeping. In *Ouderkirk* v. *Central Nat. Bank* (119 N. Y. 263, 267), it is said that in such a case, " the burden of showing the circumstances of the loss rests upon the bailee, and, unless the evidence shows the exercise of due care by him according to the nature of the bailment, he will be held responsible for the breach of his contract to return the property bailed." Though a gratuitous bailee only, failure to deliver the property to plaintiff on demand constituted gross negligence which amounted to a breach of its obligations and called for explanation (*Dalton* v. *Hamilton Hotel Operating Co.*, 242 N. Y. 481, 488). Right of recovery for the loss " rests on the presumption arising from delivery, demand and refusal,

without affirmative proof of negligence in any respect " (*Hasbrouck* v. *N. Y. C. &.H. R. R. R. Co.*, *supra*, p. 376).

Upon the same proof an action for conversion would rest and the dismissal of that cause of action was erroneous. It does not follow, for that reason, that a new trial must be had. After motion for the direction of a verdict upon the first cause of action, we are required to render such judgment as should have been rendered on the undisputed facts by the courts below.

The judgments appealed from should be modified by a direction that the plaintiff recover from the defendant the sum of $13,360, with interest from February 14, 1937, and by striking out the provision for the award of costs to the defendant in each judgment in the lower courts, and as so modified, affirmed, with costs to the plaintiff in all courts.

LEHMAN, Ch. J., LOUGHRAN and DESMOND, JJ., concur with LEWIS, J.; RIPPEY, J., dissents in opinion in which FINCH and CONWAY, JJ., concur.

Judgment affirmed. (See 290 N. Y. 872.)